**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Michael Todd Huffman, | : | Case No. 3:13 CV 152 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **MEMORANDUM OPINION** |
| Defendant, | : | **AND ORDER** |

## I. INTRODUCTION

Plaintiff Michael Todd Huffman ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 15) and Plaintiff's Reply (Docket No. 16). For the reasons that follow, the decision of the Commissioner is reversed and remanded.

## II. PROCEDURAL BACKGROUND

On November 27, 2009, Plaintiff filed an application for a period of SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381, alleging a period of disability beginning April 1, 2009 (Docket

1

No. 13, pp. 21,183 of 1493). Plaintiff's claim was denied initially on June 8, 2010 (Docket No. 13, p. 102 of 1493), and upon reconsideration on August 16, 2010 (Docket No. 13, p. 109 of 1493). Plaintiff thereafter filed a timely written request for a hearing on August 26, 2010 (Docket No. 13, p. 116 of 1493).

On May 20, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Craig R. Petersen ("ALJ Petersen") (Docket No. 13, pp. 35-99 of 1493). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 13, pp. 88-97 of 1493). ALJ Petersen found Plaintiff to have a severe combination of rheumatoid arthritis of the right knee, left wrist, and left hip, right shoulder degenerative disease, asthma, obesity, and depression (Docket No. 13, p. 21 of 1493).

Despite these limitations, ALJ Petersen determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the application date through the date of his decision (Docket No. 13, p. 29 of 1493). ALJ Petersen found Plaintiff had the residual functional capacity to perform sedentary work with the following accommodations:

1. Lift ten pounds occasionally

2. Sit/stand option

3. Stand and/or walk up to two hours during an eight-hour day with normal breaks

4. Sit up to six hours during an eight-hour day with normal breaks
5. Occasionally stoop, kneel, crouch, and climb stairs or ramps, but never crawl or climb ladders, ropes, or scaffolds

6. Avoid unprotected heights, dangerous machinery, and concentrated exposure to heat, cold, humidity, gases, and fumes

7. No repetitive gripping or grasping bilaterally

8.      Only simple, routine, and repetitive tasks free of fast-paced production requirements

9.      Only activities involving simple, work-related decision-making and few, if any, workplace changes

10.     Only occasional interaction with coworkers, supervisors, and the public

(Docket No. 13, p. 24 of 1493). The ALJ found Plaintiff unable to perform any past relevant work (Docket No. 13, p. 27 of 1493), but able to perform other work in the national economy (Docket No. 13, p. 28 of 1493). Plaintiff's request for benefits was therefore denied (Docket No. 13, p. 29 of 1493).

On January 22, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Western Division, seeking judicial review of his denial of SSI (Docket No. 1). In his pleading, Plaintiff alleged the ALJ failed to support his findings at steps three and five of the sequential evaluation with substantial evidence (Docket No. 14). Defendant filed its Answer on April 4, 2013 (Docket No. 12). On July 24, 2013, in accordance with 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties consented to the jurisdiction of the undersigned Magistrate for all further proceedings in the case, including trial and entry of a final judgment (Docket No. 18).

### III. FACTUAL BACKGROUND

#### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on May 20, 2011 (Docket No. 13, p. 35 of 1493). ALJ Petersen appeared from Mount Pleasant, Michigan (Docket No. 13, p. 37 of 1493) while Plaintiff, represented by counsel Shannon Bateson, appeared and testified from Toledo, Ohio (Docket No. 13, pp. 40-53, 69 of 1493). Also present and testifying was VE Toni McFarland ("VE McFarland") (Docket No. 13, pp. 88-97 of 1493).

1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was forty-six years old and residing with his girlfriend in a second-story apartment building without an elevator (Docket No. 13, pp. 40-41 of 1493). Plaintiff testified he received $115 per month from welfare and $200 per month in food stamps (Docket No. 13, p. 41 of 1493). Plaintiff does not have a driver's license and has not had one since 1996, when it was revoked following a car accident in which there was a fatality (Docket No. 13, pp. 41-42 of 1493). During his time in school, Plaintiff was involved in special education classes for all subjects and eventually dropped out (Docket No. 13, pp. 69-70 of 1493). He later earned his GED (Docket No. 13, p. 69 of 1493). Plaintiff also completed a nine-month course to earn his motorcycle technician certificate, but has never been employed utilizing his technician skills (Docket No. 13, pp. 70-71 of 1493). He was incarcerated from 1998-2002 and again from 2007-2008 (Docket No. 13, pp. 80-81 of 1493). Plaintiff testified that he uses marijuana one to two times per week, if someone buys it for him, but denied the use of any other recreational drugs (Docket No. 13, pp. 83-84 of 1493). Plaintiff also stated he drinks three to four beers per week while visiting friends (Docket No. 13, p. 85 of 1493).

Plaintiff has primarily been employed as a general laborer, most recently working at Duracoat Powder Finishing, Inc (Docket No. 13, pp. 71-73 of 1493). Prior to Duracoat, Plaintiff worked at StaffMark LLC and Sauder Woodworking Company (Docket No. 13, pp. 73-77 of 1493). Plaintiff testified he also briefly worked as a garbage man (Docket No. 13, p. 74 of 1493). Upon his release from prison in 2002, Plaintiff owned his own business recycling wood pallets (Docket No. 13, p. 86 of 1493).

Plaintiff gave testimony concerning a number of his alleged impairments, including his arthritis, diabetes, thyroid disorder, hypertension, obesity, and depression (Docket No. 13, pp. 40-53 of

4

1493). With regard to his arthritis, Plaintiff stated he was diagnosed with rheumatoid arthritis in 2004 and claimed the disease affects every single one of his joints, although most prominently his right knee, wrist, and shoulder, as well as his fingers and ankles (Docket No. 13, pp. 43-46 of 1493). Plaintiff testified he had both his right knee and left hip replaced (Docket No. 13, p. 44 of 1493). He indicated he does not take any prescription medication specifically for treatment of his arthritis and manages his symptoms with basic pain medication (Docket No. 13, p. 47 of 1493). When asked to describe his symptoms, Plaintiff testified his ankles swell and fill up with fluid and he can bend his knees only a little, but cannot squat down (Docket No. 13, p. 48 of 1493). He cannot walk very far without his hip giving out and requires the use of a cane to stabilize both sides of his body (Docket No. 13, pp. 49-50 of 1493). Plaintiff stated he does not wear any braces (Docket No. 13, p. 51 of 1493).

When asked about his daily activities, Plaintiff indicated he gets up in the morning, watches television, and then lays back down, alternating between the living room and the bedroom (Docket No. 13, p. 55 of 1493). Plaintiff testified that he does not do the dishes, laundry, cooking, vacuuming, or sweeping (Docket No. 13, p. 48 of 1493). He claimed that he does not usually leave the house except once a week when he visits friends and plays cards for about an hour (Docket No. 13, pp. 55-56 of 1493). He also stated that he goes to an auction on Saturdays for about an hour, but must sit down (Docket No. 13, pp. 60-61 of 1493). Plaintiff does not attend religious services, but occasionally goes out to eat, visits friends in the country, and watches his grandchildren (Docket No. 13, pp. 59, 63-64 of 1493). When Plaintiff goes shopping, he uses a motorized scooter while in the store (Docket No. 13, p. 83 of 1493).

Plaintiff also testified as to his residual functional capacity. He indicated he can lift and carry ten pounds and can stand in one place for ten to twenty minutes at a time (Docket No. 13, pp. 51-52 of

5

1493). Plaintiff testified that he can walk around the block and sit for two hours at a time before needing to change position (Docket No. 13, p. 52 of 1493). Although he can grab with his right hand and use his fingers, he can grab "very little" with his left hand (Docket No. 13, p. 54 of 1493). Plaintiff indicated he cannot use his arms above his shoulders and cannot squat at all (Docket No. 13, pp. 53, 55 of 1493). Plaintiff testified that he can usually dress himself, unless his shoulder is out (Docket No. 13, p. 55 of 1493).

## 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a woodworker as medium and unskilled, as a furniture assembler as heavy, as a saw operator as medium, and as a block press operator as medium (Docket No. 13, p. 92 of 1493). The ALJ then posed his first hypothetical question:

> I want you to assume an individual the same age, education and work history as the claimant who can lift and carry up to [twenty] pounds occasionally and [ten] pounds frequently; can push/pull up to [ten] pounds occasionally, can stand or walk up to two hours out of an eight-hour day and sit up to six hours out of an eight-hour workday with normal breaks; can occasionally stair and ramp climb, but no ropes, ladders or scaffolds; can occasionally stoop, kneel, crouch, but not crawl; must avoid unprotected heights and dangerous machinery.
>
> There would be – avoid concentrated exposure to heat, humidity, gases and fumes, and cold . . . Also, there would be no repetitive gripping and grasping bilaterally. There would be no visual or communications limitations and no limitations with regard to concentration, persistence and pace, and no social deficits.
>
> Based on that hypothetical, could this person perform past relevant work?

(Docket No. 13, p. 93 of 1493). Taking into account these limitations, the VE testified that such an individual would not be able to perform Plaintiff's past work (Docket No. 13, pp. 92-93 of 1493). However, the VE stated that there were other jobs that such an individual could perform, including: (1)

6

counter clerk worker, listed under DOT[1] 249.366-010, for which there are 3,100 positions nationally

and 100 in the State of Ohio; and (2) furniture rental consultant, listed under DOT 295.357-018, for

which there are 162,000 positions nationally and 5,900 in the State of Ohio (Docket No. 13, pp. 94-95

of 1493).

ALJ Petersen then posed his second hypothetical question:

I want you to consider the first hypothetical, but the exertional levels would be less than ten pounds occasionally. There would be a sit/stand option at-will. The work would be limited to simple, routine, and repetitive tasks, free of fast-paced production requirements. The work would involve simple, work-related decisions with few, if any, workplace changes, along with occasional interaction with co-workers, supervis[ors] and the public. Based on that hypothetical, would there be other work?

(Docket No. 13, p. 95 of 1493). Given these limitations, the VE stated that the other work would be

limited to a surveillance systems monitor, listed under DOT 379.367-010, for which there are 25,000

positions nationally and 500 in the State of Ohio (Docket No. 13, p. 96 of 1493).

ALJ Petersen then posed his third, and final, hypothetical:

I want you, again, to assume the first two hypotheticals, but this time the person would be off task [twenty] percent or more during a workday, and miss two or more days on a consistent basis each month due to ongoing physical and/or mental impairments. Based on that hypothetical, would there be other work?

(Docket No. 13, p. 96 of 1493). VE McFarland answered in the negative, stating that these limitations

were work-preclusive (Docket No. 13, p. 96 of 1493).

During cross-examination, Plaintiff's counsel questioned the VE about the use of a cane or

other ambulatory device and how that would affect any of the other jobs listed (Docket No. 13, p. 97 of

1493). The VE indicated that such devices would not affect the other jobs given (Docket No. 13, p. 97

of 1493).

---

[1] Dictionary of Occupational Titles.

**B.**     **MEDICAL RECORDS**

Plaintiff's records addressing his arthritis date back to March 9, 2004, when Plaintiff saw Dr.

Michael Ralston, MD ("Dr. Ralston"), who diagnosed Plaintiff with degenerative arthritis of the knees

bilaterally (Docket No. 13, p. 948 of 1493). Dr. Ralston recommended consistent use of oral anti-

inflammatory medications and aspiration and injection of the right knee (Docket No. 13, p. 948 of

1493). By July 24, 2004, Plaintiff reported that he was improving with the use of Aleve and a

Neoprene sleeve brace (Docket No. 13, p. 946 of 1493). Dr. Ralston noted that Plaintiff had full range

of motion in his right knee (Docket No. 13, p. 946 of 1493).

On October 6, 2004, Plaintiff saw Dr. Tauseef Syed, MD ("Dr. Syed") complaining of pain and

swelling in his right knee and left wrist (Docket No. 13, p. 937 of 1493). Plaintiff rated his pain as a

ten out of a possible ten (Docket No. 13, p. 937 of 1493). Plaintiff was walking with crutches and

denied having problems with any other joints (Docket No. 13, p. 937 of 1493). His grip strength was

five out of five on his right side and 4.5 out of five on his left (Docket No. 13, p. 937 of 1493).

Plaintiff did not have any tenderness in his right wrist, but his left wrist was significantly tender with

minimal swelling (Docket No. 13, pp. 937-38 of 1493). His right knee was swollen, hot, and tender

(Docket No. 13, p. 938 of 1493). Dr. Syed concluded that it was too early to diagnose Plaintiff with

rheumatoid arthritis and instead diagnosed him with inflammatory arthritis (Docket No. 13, p. 938 of

1493).

Plaintiff did not return to Dr. Syed until June 3, 2005 (Docket No. 13, p. 939 of 1493). Dr.

Syed noted that Plaintiff missed his previously scheduled appointment (Docket No. 13, p. 939 of

1493). Plaintiff complained of right knee swelling and stated both his wrists and ankles were in pain

(Docket No. 13, p. 939 of 1493). He had grip strength of 4.5 out of five on the right and four out of

five on the left (Docket No. 13, p. 939 of 1493). Plaintiff's right wrist was slightly tender, but his left was significantly swollen and tender (Docket No. 13, p. 939 of 1493). Additionally, Plaintiff's left knee and ankle were slightly swollen (Docket No. 13, p. 939 of 1493). Dr. Syed confirmed her earlier diagnosis of inflammatory arthritis (Docket No. 13, p. 940 of 1493).

Plaintiff's records then jump to February 14, 2006, when Plaintiff had a radiological evaluation done of his right knee, which revealed severe degenerative changes (Docket No. 13, p. 898 of 1493). Scans done on March 1, 2006, showed osteoarthritis in Plaintiff's left wrist, but no significant degenerative change in his right wrist (Docket No. 13, p. 896 of 1493). In December 2006, scans indicated Plaintiff suffered from significant degenerative changes in his right knee and an apparent collapse of part of the scaphoid bone[2] and diffuse abnormalities in his left wrist, possibly attributable to rheumatoid arthritis (Docket No. 13, p. 894 of 1493).

Plaintiff returned to Dr. Syed on January 19, 2007, complaining of pain and swelling in his right knee and significant pain in his left knee (Docket No. 13, p. 907 of 1493). Plaintiff rated the pain in his right knee as a ten out of a possible ten (Docket No. 13, p. 907 of 1493). It was hard for Plaintiff to walk, and Dr. Syed noted that he was using crutches (Docket No. 13, p. 907 of 1493). While Plaintiff's right wrist was normal upon examination, Plaintiff's left wrist was totally unmovable and tender to the touch (Docket No. 13, pp. 907-08 of 1493). Plaintiff's shoulders, elbows, ankles, and feet were normal and pain-free (Docket No. 13, p. 907 of 1493). Plaintiff also had normal muscle strength in his upper and lower extremities (Docket No. 13, p. 908 of 1493). Plaintiff had significant tenderness

---

[2] Also known as the navicular bone. One of the eight small bones of the wrist. The navicular bone is the first bone, from the thumb side, of the row of bones which is nearer the forearm. ATTORNEYS' DICTIONARY OF MEDICINE, N-78720 (2009).

around his left iliac bone,[3] but his right hip was normal (Docket No. 13, p. 908 of 1493). Plaintiff's right knee was swollen, tender, and warm, but his left knee was symptom-free (Docket No. 13, p. 908 of 1493). Dr. Syed again diagnosed Plaintiff with inflammatory arthritis, but noted that Plaintiff may also suffer from rheumatoid arthritis (Docket No. 13, p. 909 of 1493).

On May 23, 2007,[4] x-rays of Plaintiff's left hip and wrist revealed advanced degenerative joint disease with considerable space-narrowing, dense subarticular sclerosis, hypertrophic spurs, and multiple subchondral cysts (Docket No. 13, pp. 516-17 of 1493).  An updated x-ray of Plaintiff's left hip, done in July 2007, revealed chronic subluxation superolaterally with a widening of the joint space medially (Docket No. 13, p. 514 of 1493). Plaintiff's hip also had marked sclerosis and cystic changes involving the femoral head and acetabulum with proliferative changes laterally and underlying flattening of the femoral head (Docket No. 13, p. 514 of 1493). Plaintiff's right knee had arthritic changes, complete joint space narrowing, and subchondral condensation (Docket No. 13, p. 515 of 1493).

On August 29, 2007, Plaintiff saw Dr. Madhu Mehta, MD ("Dr. Mehta") complaining of significant joint pain, swelling, and stiffness (Docket No. 13, p. 283 of 1493). Plaintiff had no range of motion in his left wrist and noticeable osteoarthritic changes in his hands (Docket No. 13, p. 283 of 1493). His right knee also showed a decreased range of motion (Docket No. 13, p. 283 of 1493). Plaintiff reported some relief from his regimen of Motrin and Tylenol (Docket No. 13, p. 283 of 1493). His bloodwork was suggestive of rheumatoid arthritis (Docket No. 13, p. 283 of 1493). Dr. Mehta

---

[3] Pertaining to, or involving, the ilium, the upper part of the hipbone. ATTORNEYS' DICTIONARY OF MEDICINE, I-58933.

[4] It should be noted that, at some point in 2007, Plaintiff became incarcerated and remained so until September 2008 (Docket No. 13, p. 913 of 1493).

removed fluid from Plaintiff's right knee and recommended Plaintiff begin Methotrexate (Docket No. 13, p. 283 of 1493).

On November 28, 2007, Plaintiff underwent arthroplasty of the right knee and left hip arthroplastys[5] (Docket No. 13, p. 353 of 1493). Plaintiff was discharged from the hospital on December 5, 2007 (Docket No. 13, pp. 353-64 of 1493). Between July 2008 and October 2008, Plaintiff underwent a series of radiology scans. An x-ray of his left wrist revealed extensive advanced degenerative arthritic changes with advanced narrowing of most of the visualized joints and abnormal bones that could be due to chronic osteoarthritic changes (Docket No. 13, pp. 508, 893 of 1493). An x-ray of Plaintiff's right hip revealed mild arthrosis (Docket No. 13, p. 507 of 1493).

On October 14, 2008, Plaintiff saw Dr. Lamberto Diaz, MD ("Dr. Diaz") complaining of arthritis in his left wrist (Docket No. 13, p. 905 of 1493). He was asymptomatic in both his right knee and left hip and claimed he could walk one to two miles, although he had difficulty with stairs (Docket No. 13, pp. 905-06 of 1493). Plaintiff had grip strength of three out of five in his left hand (Docket No. 13, p. 906 of 1493). Dr. Diaz diagnosed Plaintiff with rheumatoid arthritis, hypertension, chronic obstructive pulmonary disease ("COPD"), and obesity (Docket No. 13, p. 906 of 1493).

Plaintiff saw Dr. Michael Sauber, MD ("Dr. Sauber") in January 2009 complaining of pain in his left wrist, along with a decreased range of motion (Docket No. 13, p. 913 of 1493). Dr. Sauber diagnosed Plaintiff with possible sero-negative rheumatoid arthritis (Docket No. 13, p. 914 of 1493). Radiology scans, done on February 6, 2009, revealed mild degenerative changes in the left patella-femoral joint, mild degenerative changes in his right shoulder, and degenerative changes in his left

---

[5] Surgery to reshape, reconstruct, or replace a diseased or damaged joint. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

wrist (Docket No. 13, pp. 979-84 of 1493). Plaintiff was diagnosed with osteoarthritis or inflammatory arthritis in his left wrist (Docket No. 13, p. 982 of 1493). Plaintiff returned to Dr. Sauber on September 28, 2009 (Docket No. 13, p. 1040 of 1493). Dr. Sauber noted that Plaintiff's left knee pain was significant, but not enough to consider surgery (Docket No. 13, p. 1040 of 1493).

On November 10, 2009, Plaintiff saw Dr. Amer Arshad, MD ("Dr. Arshad"), reporting that he had to walk with crutches because of the pain in his left knee (Docket No. 13, p. 1127 of 1493). Upon examination, Plaintiff's left knee showed no redness, heat, or joint effusion (Docket No. 13, p. 1127 of 1493). On November 27, 2009, Plaintiff began treating with Dr. Stanislaw Dajczak, MD ("Dr. Dajczak") (Docket No. 13, p. 1221 of 1493). Plaintiff complained of knee and wrist pain (Docket No. 13, p. 1221 of 1493). During an appointment with Dr. Dajczak on December 22, 2009, Plaintiff was reported to be using crutches, and complained of aching pain in his left wrist (Docket No. 13, p. 1224 of 1493). Dr. Dajczak discussed with Plaintiff the possibility of a total left knee arthroplasty (Docket No. 13, p. 1226 of 1493). It appears that Plaintiff attempted physical therapy in January 2010 (Docket No. 13, pp. 1149-58 of 1493).

Plaintiff was ultimately scheduled to undergo a left total knee replacement on January 13, 2010, but, when Plaintiff was examined on the day of surgery, it was determined that Plaintiff's knee was infected (Docket No. 13, p. 1122 of 1493). Therefore, Plaintiff's replacement surgery was converted into an irrigation procedure to rid Plaintiff's knee of the septic arthritis (Docket No. 13, p. 1124 of 1493). Plaintiff was admitted to the hospital to treat the infection and was discharged on January 15, 2010 (Docket No. 13, pp. 1125, 1353 of 1493). He was then sent to the Bryan Care and Rehabilitation Center to recover (Docket No. 13, p. 1280 of 1493).

Plaintiff returned to Dr. Arshad on February 1, 2010 (Docket No. 13, p. 1351 of 1493). At that

12

time, Plaintiff was not complaining of much joint pain and his left knee showed no redness, heat, or drainage (Docket No. 13, p. 1351 of 1493). Radiology scans taken on March 2, 2010, found the status of Plaintiff's left knee to be consistent with either rheumatoid arthritis or osteomyelitis[6] (Docket No. 13, p. 1336 of 1493). By March 5, 2010, Plaintiff reported that he had no pain in his left knee and stated that "overall he [was] feeling good and [did] not have much pain in the knee" (Docket No. 13, p. 1349 of 1493).

However, on May 3, 2010, Plaintiff returned to Dr. Diaz complaining that his left knee gave out during ambulation and stated that he could not walk more than a block and a half (Docket No. 13, p. 1266 of 1493). Plaintiff also reported not being able to stand or sit for more than thirty to forty-five minutes, and stated he could climb one flight of stairs but with difficulty (Docket No. 13, p. 1266 of 1493). He also reported recurrent swelling and stiffness of his right wrist (Docket No. 13, p. 1266 of 1493). Upon examination, Dr. Diaz noted Plaintiff had good grip, flexion, and extension, and could open a jar and turn a doorknob with his right hand (Docket No. 13, p. 1266 of 1493). Plaintiff's left wrist had very restricted range of motion with effusion, crepitus, and tenderness (Docket No. 13, p. 1267 of 1493). Plaintiff's left knee was tender but had better range of motion than the right (Docket No. 13, p. 1267 of 1493).

Plaintiff returned to Dr. Dajczak on May 26, 2010,  for disability reasons and reported that he was unable to do any work (Docket No. 13, p. 1390 of 1493). He described his knee symptoms as mild and unchanged, although he used a cane (Docket No. 13, p. 1390 of 1493). Plaintiff also complained of moderate pain, stiffness, and a decreased range of motion in his left wrist (Docket No. 13, p. 1390 of

---

[6] Inflammation of a bone and its marrow, caused by infection with bacteria or other microorganisms. ATTORNEYS' DICTIONARY OF MEDICINE, O-84949.

13

1493). On June 10, 2010, Plaintiff told Dr. Dajczak his knee pain was improved, but his left wrist pain was still at a level four out of a possible ten (Docket No. 13, p. 1393 of 1493). An x-ray of Plaintiff's left knee revealed moderate joint space loss in the lateral compartment and mild degenerative changes (Docket No. 13, p. 1394 of 1493). An x-ray of his left wrist showed severe degenerative changes (Docket No. 13, p. 1394 of 1493). On June 29, 2010, Plaintiff saw Dr. Luis E. Jauregui, MD ("Dr. Jauregui") (Docket No. 13, p. 1322 of 1493). Plaintiff reported that he could walk with the assistance of a cane for a majority of the day but, by evening, needed to use crutches (Docket No. 13, p. 1322 of 1493). Between June 25, 2010, and July 14, 2010, Plaintiff had three injections of Euflexa in his left knee (Docket No. 13, pp. 1396-1401 of 1493). Plaintiff saw Dr. Sauber on December 13, 2010, still complaining of pain in his left wrist (Docket No. 13, p. 1411 of 1493).

On April 1, 2011, Plaintiff reported to the Montpelier Hospital Emergency Room ("Montpelier ER") complaining of significant pain in his right shoulder (Docket No. 13, p. 1468 of 1493). Plaintiff was given Percocet and transferred to the University of Toledo Medical Center Emergency Room ("UTMC ER") (Docket No. 13, p. 1469 of 1493). Upon examination, Plaintiff had minimal tenderness upon palpation, and active range of motion to 170 degrees forward flexion and 100 degrees of abduction, and a motor strength of five out of five (Docket No. 13, p. 1448 of 1493). There was no instability noted in the shoulder and Plaintiff was diagnosed with impingement syndrome (Docket No. 13, p. 1440 of 1493).

On April 14, 2011, Plaintiff saw Dr. Matthew Grothaus, MD ("Dr. Grothaus") complaining of pain in his right shoulder and hip, and left wrist and hip (Docket No. 13, p. 1489 of 1493). When asked, Plaintiff stated his most serious pain was in his right shoulder (Docket No. 13, p. 1489 of 1493). His right shoulder had good strength and range of motion, but was tender and showed a slight internal

14

weakness with external rotation (Docket No. 13, p. 1489 of 1493). He had pain during cross-body

motion, and upon supraspinatus stress testing, Hawkins testing,[7] and Neer's testing[8] (Docket No. 13, p.

1489 of 1493). Plaintiff was diagnosed with right shoulder impingement and rotator cuff syndrome

(Docket No. 13, p. 1489 of 1493). An MRI of Plaintiff's right shoulder later revealed tendinosis

involving the supra- and infra-spinatus tendon with focal fluid collection in the posterior supraglenoid

notch (Docket No. 13, pp. 1462-63 of 1493).  The scan also showed degenerative changes in the

acromioclavicular joint and a greater tuberosity of the humerus (Docket No. 13, p. 1463 of 1493).

## C.   EVALUATIONS

### 1.   PSYCHOLOGICAL EVALUATION

On March 31, 2010, at the request of the Bureau of Disability Determination ("BDD"), Plaintiff

underwent a Psychological Evaluation with Dr. J. Bruce Kelly, M.Ed ("Dr. Kelly") (Docket No. 13,

pp. 1244-51 of 1493). Plaintiff was generally cooperative during the evaluation and seemed motivated

to participate in the interview (Docket No. 13, p. 1246 of 1493). Plaintiff described himself as being

depressed and reported a loss of energy and persistence (Docket No. 13, p. 1246 of 1493). His memory

registration and recall were age appropriate and his overall level of cognitive skill was estimated to be

in the average range (Docket No. 13, p. 1248 of 1493). When asked about his daily activities, Plaintiff

---

[7] A test performed in the evaluation of shoulder pain. The examiner raises the patient's arm to 90 degrees with the elbow extended, and internally rotates the arm. The test is considered positive if the patient experiences pain as internal rotation is increased, indicating impingement of soft tissues between the greater tuberosity of the humerus and the acromion. ATTORNEYS' DICTIONARY OF MEDICINE, H-52650.

[8] A test performed in the evaluation of shoulder pain. The examiner internally rotates the patient's arm with the elbow extended and then raises the arm in the rotated position. An attempt is made to bring the arm to 180 degrees. The test is considered positive when the patient experiences pain before the arm is raised to its full elevation, indicating impingement of soft tissues between the bony joint components. ATTORNEYS' DICTIONARY OF MEDICINE, N-78929.

reported that he woke up at eight o'clock and watched television all day (Docket No. 13, p. 1248 of 1493). He was not responsible for any of the household duties and reported visiting with a friend daily (Docket No. 13, p. 1249 of 1493). Dr. Kelly diagnosed Plaintiff with depression and assigned him a Global Assessment of Functioning ("GAF")[9] score of sixty-five (Docket No. 1249 of 1493).

## 2.     PSYCHIATRIC REVIEW TECHNIQUE

On April 9, 2010, Plaintiff underwent a Psychiatric Review Technique with state examiner Dr. Cynthia Waggoner, Psy.D ("Dr. Waggoner") (Docket No. 13, pp. 1108-21 of 1493). Dr. Waggoner noted Plaintiff suffered from depressive disorder not otherwise specified (Docket No. 13, p. 1111 of 1493). In assessing "Paragraph B" criteria,[10] Dr. Waggoner found Plaintiff to have a mild degree of limitation with regard to his activities of daily living and maintaining concentration, persistence, or pace, with no episodes of decompensation (Docket No. 13, p. 1118 of 1493). Dr. Waggoner did not find the presence of any "Paragraph C" criteria[11] (Docket No. 13, p. 1119 of 1493).

## 3.     MANUAL MUSCLE TESTING EVALUATION

On May 3, 2010, Dr. Diaz, at the request of the BDD, completed a Manual Muscle Testing Evaluation of Plaintiff's abilities (Docket No. 13, pp. 1262-65 of 1493). The evaluation was largely

---

[9] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of sixty-five indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

[10] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[11] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

unremarkable, with Dr. Diaz reporting normal levels for all areas tested (Docket No. 13, pp. 1262-65 of 1493).

### 4.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On June 1, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. W. Jerry McCloud, MD ("Dr. McCloud") (Docket No. 13, pp. 1314-21 of 1493). Dr. McCloud found Plaintiff could (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of two hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited pushing and pulling (Docket No. 13, p. 1315 of 1493). With regard to postural limitations, Dr. McCloud opined that Plaintiff could: (1) never climb ladders, ropes, or scaffolds; (2) occasionally crouch and crawl; and (3) frequently balance, stoop, and kneel (Docket No. 13, p. 1316 of 1493). Plaintiff had limited gross and fine manipulation (Docket No. 13, p. 1317 of 1493). He had no visual, communicative, or environmental limitations (Docket No. 13, pp. 1317-18 of 1493).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

18

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Petersen made the following findings:

1. Plaintiff has not engaged in substantial gainful activity since November 27, 2009, the application date.

2. Plaintiff has the following severe impairments: rheumatoid arthritis of the right knee, left wrist, and left hip, right shoulder degenerative joint disease, asthma, obesity, and depression.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

4. Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) with the following limitations: (1) lift ten pounds occasionally; (2) requires a sit/stand option; (3) stand and/or walk for two hours during an eight-hour workday; (4) sit for six hours during an eight-hour workday; (5) occasionally stoop, kneel, crouch, or climb stairs or ramps; (6) never climb ladders, ropes, scaffolds, or crawl; (7) avoid unprotected heights, dangerous machinery, and concentrated exposure to heat, cold, humidity, gases, and fumes; (8) cannot perform repetitive gripping or grasping bilaterally; (9) can perform simple, routine, and repetitive tasks free of fast-paced production requirements; (10) can perform work activities involving simple, work-related decision-making and few, if any, workplace changes; and (11) can have occasional interaction with coworkers, supervisors, and the public.

5. Plaintiff is unable to perform any past relevant work.

6.     Plaintiff was born on July 27, 1964, and was 44 years old, which is defined as a younger individual age 18-44 on the date the application was filed. Plaintiff subsequently changed age category to a younger individual age 45-49.

7.     Plaintiff has at least a high school education and is able to communicate in English.

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

9.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.    Plaintiff has not been under a disability, as defined in the Social Security Act, since November 27, 2009, the date the application was filed.

(Docket No. 13, pp. 21-29 of 1493). ALJ Petersen denied Plaintiff's request for SSI benefits (Docket No. 13, p. 29 of 1493).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges the ALJ failed to support his findings at steps three and five with substantial evidence (Docket No. 14). Specifically, Plaintiff alleges the ALJ failed to undertake the proper analysis when determining if Plaintiff met the criteria set forth in Listing 14.09 (Docket No. 14). Additionally, Plaintiff claims the ALJ erred by finding there to be sufficient "other work" that existed in significant numbers in the national economy (Docket No. 14).

### B.    DEFENDANT'S RESPONSE

Defendant disagrees, arguing that the ALJ's decision is supported by substantial evidence (Docket No. 15).

### C.    DISCUSSION

#### 1.    LISTING 14.09 (INFLAMMATORY ARTHRITIS)

Plaintiff first claims that ALJ Petersen failed to properly analyze whether he met the criteria for inflammatory arthritis, found in Social Security Listing 14.09 (Docket No. 14, pp. 5-8 of 12). According to Plaintiff, the ALJ did not compare the information found in the medical evidence to the requirements of Listing 14.09; rather, the ALJ simply made a cursory and general conclusion that Plaintiff's impairments did not meet the Listing (Docket No. 14, p. 5 of 12). The undersigned magistrate agrees.

21

When determining whether a claimant is disabled for purposes of awarding disability, the Commissioner must determine whether one, or a combination of more than one, of a claimant's severe impairments either meets or are equivalent in severity to one or more of the "listed" medical conditions. 20 C.F.R. §§ 404.1520(d), 416.920(d). These "listed" medical conditions "describes for each of the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of . . . her age, education, or work experience." 20 C.F.R. § 404.1525(a). Within each listing, the Social Security Administration specifies the medical and other findings needed to satisfy the criteria of that particular listing. 20 C.F.R. § 404.1525(c)(3). A claimant's impairment meets a listed impairment only when it manifests the specific findings described in the set of medical criteria for the particular listed impairment. 20 C.F.R. §§ 404.1525(d), 416.925(d). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). It is the claimant's burden to bring forth evidence to establish that she meets or equals a listed impairment. *See Evans v. Sec'y of Health and Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1981) (per curiam).

In determining whether a claimant suffers a disability from inflammatory arthritis, the ALJ must determine whether he meets the criteria set forth in Listing 14.09, which requires, in relevant part:

> A. Persistent inflammation or persistent deformity of: (1) one or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively; or (2) one or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively.

20 C.F.R. Part 404, Subpart P, Appendix 1. Under the listings, an "inability to ambulate effectively

22

means an extreme limitation in the ability to walk, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart P, Appendix 1. Therefore, "ineffective ambulation" is defined as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpart P, Appendix 1. Examples include the inability to: (1) walk without the use of a walker, two crutches or canes; (2) walk a block at a reasonable pace on rough or uneven surfaces; (3) use standard public transportation; (4) carry out routine ambulatory activities; or (5) climb a few steps at a reasonable pace without the use of a single handrail. 20 C.F.R. Part 404, Subpart P, Appendix 1.

Plaintiff's medical record is replete with examples of extreme joint pain, difficulty with ambulation, and persistent inflammation. For example, in 2007, Plaintiff underwent total right knee and left hip arthroplastys (Docket No. 13, pp. 353-64 of 1493) after numerous radiologic scans showing advanced degenerative joint disease and arthritic changes (Docket No. 13, pp. 514-17 of 1493). There were also several notations in the record, in addition to Plaintiff's own testimony, that he required the assistance of crutches, canes, and motorized scooters (Docket No. 13, pp. 50, 82, 83, 907, 937, 1127, 1224, 1322, 1390 of 1493). However, there is also evidence that Plaintiff's symptoms subsided with some treatment (Docket No. 13, pp. 946, 1346, 1349, 1351, 1390, 1393 of 1493) and he could walk one to two miles (Docket No. 13, p. 905 of 1493).

It is well established that the trier of fact has the duty to resolve any conflicts in medical evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). Judicial review "is limited in scope to determining whether the findings of fact made by the [Commissioner] are supported by substantial evidence and deciding whether the [Commissioner] employed the proper legal criteria in reaching her

23

conclusion." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Therefore, this Court may not try

the case *de novo, nor resolve conflicts in evidence*, nor decide questions of credibility." *Id.* (*citing*

*Myers v. Richardson*, 471 F.2d 1265 (6th Cir. 1972)) (emphasis added).

Here, ALJ Petersen failed to compare Plaintiff's reported symptoms, and lack thereof, to the

requirements set forth in Listing 14.09 (Docket No. 13, pp. 19-29 of 1493). Absent this analysis, this

Court cannot now determine whether the ALJ's findings were based on substantial evidence.

Accordingly, the decision of the Commissioner as to whether Plaintiff meets Listing 14.09 is reversed

and remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Commissioner is

ordered to consider Plaintiff's medical records in their entirety and, if necessary, solicit the testimony

of an expert witness or order Plaintiff to undergo a consultative examination. The Commissioner shall

also include his specific findings on whether Plaintiff meets the criteria set forth in Listing 14.09 in his

written decision.

### 2.    OTHER JOBS

In his second assignment of error, Plaintiff alleges the ALJ erred in finding that the "other job"

proffered by the VE, namely that of surveillance systems monitor, existed in significant numbers in the

national economy (Docket No. 14, p. 8 of 12). In its opposition, Defendant argues that "even one

occupation is sufficient to demonstrate that there are significant numbers of jobs in the economy"

(Docket No. 15, p. 19 of 21). Given the previous decision regarding Plaintiff's satisfaction of Listing

14.09, the Court cannot yet rule on Plaintiff's second assignment of error.

"[W]ork exists in the national economy when it exists in significant numbers either in the

region where [a claimant] live[s] or in several other regions of the country." 20 C.F.R. § 404.1566(a).

It does not matter whether: (1) work exists in the immediate area where a claimant lives; (2) a specific

job vacancy exists for a claimant; or (3) a claimant would be hired if he or she applied for work. 20 C.F.R. § 404.1566(a)(1)-(3). "Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] live[s] are not considered 'work which exists in the national economy.'" 20 C.F.R. § 404.1566(b).

There is no "special number which is to be the boundary between a 'significant number' and an insignificant numbers of jobs." *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). There are a number of criteria the Commissioner should consider when determining whether work exists in significant numbers including, *but not limited to*, the following: (1) the level of a claimant's disability; (2) the reliability of VE testimony; (3) the reliability of the claimant's testimony; (4) the distance the claimant is capable of traveling to engage in the assigned work; (5) the isolated nature of the jobs; and (6) the types and availability of such work. *Id*. Ultimately, "the test is whether work exists in the national economy, not in [the claimant's] neighborhood." *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999). "The Commissioner is not required to show that job opportunities exist within the local area." *Id*.

Here, the VE stated that, given the limitations set forth by ALJ Petersen in his hypothetical questions, an individual would be able to perform other work as a surveillance systems monitor, listed under DOT 379.367-010, for which there are 25,000 positions nationally and 500 in the State of Ohio (Docket No. 13, p. 96 of 1493). Plaintiff argues that ALJ Petersen failed to take into consideration, at least in his written decision, Plaintiff's lack of skill or experience, previous need for special education classes, lack of a driver's license, and prior work as a general laborer as relevant concerns as to whether 500 *state-wide* jobs constituted a significant number (Docket No. 14, p. 10 of 12). This may be true, but, at this stage, a decision on this issue would be premature. Based upon the previous determination that the ALJ failed to properly complete the analysis with respect to Listing 14.09, this

25

Court cannot now determine whether the ALJ's "other work" assessment is based upon substantial evidence. Therefore, the decision of the Commissioner with regards to whether Plaintiff can perform other work in the national economy is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g). The Commissioner is ordered to reconsider Plaintiff's ability to perform other work using Plaintiff's entire medical record and the decision made at step three after proper analysis.

### VIII.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is reversed and remanded in its entirety pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand, the Commissioner shall consider whether Plaintiff meets the requirements set forth in Listing 14.09 and, based upon those findings, determine whether Plaintiff has the ability to return to his past work or perform other work in the national economy. **IT IS SO ORDERED.**

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   October 2, 2013